PAN AMERICAN PRODUCTION COMPANY et al., Appellants,

v.

Earl HOLLANDSWORTH et al., Appellees.

No. 10399.

Court of Civil Appeals of Texas.

Austin.

June 6, 1956.

Rehearing Denied Aug. 8, 1956.

Rex G. Baker, Nelson Jones, Dillard Baker, Houston, Powell, Wirtz, Rauhut & McGinnis, Austin, for appellant.

John Ben Shepperd, Atty. Gen., Mert Starnes, Asst. Atty. Gen., for Railroad Commission and its Members.

C. C. Renfro, Dallas, Dan Moody, J. B. Robertson, Austin, for Earl Hollandsworth.

Hurst & Burke, Longview, for Giles Harris et al.

E. P. Bryan, Dallas, for self and wife, Lena Bryan.

HUGHES, Justice.

This is a very difficult Rule 37 case. Such rule, of the Railroad Commission, regulates the spacing of oil and gas wells and it and other similar rules applying to particular fields provide that exceptions will be made in order to prevent waste or to prevent the confiscation of property.

Our trouble is, as usual, with the exceptions and, as we understand the record, is limited to the necessity of the well in suit in order to prevent confiscation of property.

The parties to this appeal are appellants, Pan American Production Company and Humble Oil and Refining Company, whose interest is stipulated, and appellees, the Railroad Commission of Texas and its members, Earl Hollandsworth, E. P. and Lena Bryan, Giles Harris, Mrs. Lucie Mae Curry et vir, Mrs. Mary Jane Lennartz et vir and John Joe Curry.

The judgment of the trial court sustained a permit issued by the Commission granting, as an exception to the spacing rule, permission to Earl Hollandsworth to drill Well No. 1, E. P. Bryan et al. lease, west half of Lot 11, Block 22, Hawkins Townsite, Hawkins Field, Wood County, Texas.

Appellants' single and very general point is that, as a matter of law, the permit was not necessary to prevent waste or confiscation.

The facts, mostly stipulated, are fairly simple, down to a point. W. B. Glenn and wife, Matilda, owned Lots 8, 9, 10 and 11, Block 22, Town of Hawkins, Wood County, at the time of their decease, intestate, in 1882 and 1883, respectively. Each lot was 30' x 115' and contiguous to each other.

These lots passed by inheritance in equal undivided shares to the five Glenn children, one of whom was R. P. Glenn who died in 1892 devising his 1/5th undivided interest to his three children, Nettie (Jeanette), Frank and Hortense Estella.

In 1913 the four original Glenn children made a deed purporting to convey all of Lots 8 and 9, then vacant and unimproved as were the other two lots, to Fowler and Holmes whose successor in title as lessors on December 31, 1940, leased for oil and gas purposes all Lots 8 and 9 which lease was on February 20, 1941, assigned to General American Oil Company of Texas.[1]

On May 13, 1919, the four original Glenn children purported to convey all Lots 10 and 11, then vacant and unimproved, to one Ussery who owned adjacent Lot 12 title to which he had acquired from another source.

Ussery conveyed Lot 10 and E/2 of Lot 11, September 6, 1919, to Floy Kay Williams et al. who on December 20, 1940, purported to lease the same for oil and gas purposes to General American Oil Company of Texas.

On December 23, 1940, Ussery purported to convey to Wood County Cotton Oil Company Lot 12 and W/2 of Lot 11, which company, as lessor, on January 13, 1941, purported to lease the same to Earl Hollandsworth for oil and gas purposes.

The grantees in the deeds to Lots 8, 9, 10 and the E/2 of Lot 11 perfected limitation title by adverse possession to the 1/5th interest therein inherited by R. P. Glenn such title being perfected prior to the application of Rule 37 to this area and prior to the severance of the minerals under any of the 4 involved lots.

Each of such four lots, exclusive of improvements, was and is of equal value.

No limitation title has been perfected to the W/2 of Lot 11.

The Hawkins Field was discovered in December, 1940.

In March, 1941, Earl Hollandsworth applied for a permit to drill a well on his "Wood County Cotton Oil Company lease" being described as Lot 12 and the W/2 of Lot 11, etc. This application was granted by the Commission on April 7, 1941, the well site being located on Lot 12. Shortly thereafter the well was drilled and has been producing oil ever since. This well is capable of draining far in excess of the recoverable oil originally or subsequently under the entire lease.

Down to this point it is obvious that the R. P. Glenn heirs right or claim to a 1/5th interest in four lots is, for all practical purposes, limited and restricted to be satisfied from a half lot, being the W/2 of Lot 11, which entire half lot is less land than such interest was rightfully entitled to receive under a division of the original four lots (1/5th of the four lots being more than 1/2 of one lot).

It is also obvious that up to this point the R. P. Glenn heirs have done nothing to prejudice their claim to the W/2 of Lot 11.

In October, 1941, and from here on the facts become much more complicated, the R. P. Glenn interests filed a suit in trespass to try title in Cause No. 8389 in the District Court of Wood County against the General American Oil Company of Texas, Earl Hollandsworth, Wood County Cotton Oil Company, Humble Oil & Refining Co. et al., the purpose of which was to recover varying interests in Lots 8, 9, 10 and 11.

The defendants, Earl Hollandsworth and General American Oil Company of Texas, in Cause 8389, filed a motion for severance as to certain issues which the court granted. This order severed for separate trial all issues relating to the 7/8ths oil, gas and min-

---

1. General American assigned its leases on Lots 8, 9, 10 and E/2 of 11 to Pan American Production Co. 8-9-46.

eral leasehold estate in the four lots. The severed cause was docketed No. 8694.

Wood County Cotton Oil Company was not a party to such severed cause.

This severed cause resulted in an agreed judgment, based upon a good and valuable consideration, which became final without an appeal and which we will later notice in detail.

The main cause, Cause 8389, resulted in a judgment that plaintiffs take nothing. Some of plaintiffs appealed and the Harris v. Wood County Cotton Oil Co., Texarkana Court of Civil Appeals, 1949, 222 S.W.2d 331, writ of error refused, n. r. e., affirmed such judgment in part and in part reversed and rendered, judgment decreeing that plaintiffs Giles Harris, guardian of the estate of M. W. Harris and Jeanette Hicks recover from Wood County Cotton Oil Company the title to and possession of the W/2 of Lot 11.

This recovery, so the opinion of the Court reflects, was upon the theory of equitable partition under which a court undertakes to set aside to nonjoining cotenants the equivalent of their interest in all the land out of the unsold tract.

During the trial and appeal of said Cause No. 8389 (including the writ of error proceeding) the plaintiffs (appellants) therein contended, among other things, that they owned an undivided 1/5th interest in Lots 8, 9, 10 and 11 and inasmuch as the sale to Ussery was the last made by the four tenants in common of R. P. Glenn, that under the doctrine of equitable partition the plaintiffs in Cause No. 8389 owned the entire underlying fee estate and royalty interest in Lots 10 and 11 or the W/2 of Lot 11, subject to said oil and gas lease from Wood County Cotton Oil Company to Earl Hollandsworth which plaintiffs in their Sixth Amended Original Petition purported to ratify, confirm and adopt and that said plaintiffs should be adjudged the owners of and recover 1/3rd of the royalty payable under said lease on both past and future pro-

duction. Wood County Cotton Oil Company, on the other hand, resisted the claims made by the plaintiffs in said Cause No. 8389 and insisted that it was the owner of the W/2 of Lot 11 by conveyance or by limitation, and even if said plaintiffs should recover title to the underlying fee estate and royalty interest in the W/2 of Lot 11, that said plaintiffs in Cause No. 8389 would have no interest in the oil produced by Earl Hollandsworth Well No. 1 Wood County Cotton Oil Company located on Lot 12, in which lot plaintiffs in Cause No. 8389 claimed no interest.

The judgment of the Court of Civil Appeals in Cause No. 8389, was, however, as above indicated.

Following final action of the courts in Cause No. 8389, E. P. Bryan and M. F. Cate acquired an interest in the recovery in such case and they and their clients executed oil and gas leases to Earl Hollandsworth dated December 7, 1949, and January 3, 1950 covering the W/2 of Lot 11, Hollandsworth subsequently (2–27–50) releasing the lease on the same property from Wood County Cotton Oil Co.

Upon application of Earl Hollandsworth the Commission on July 11, 1950, granted a permit to drill a well on the W/2 of Lot 11.

This suit to set aside such permit was filed September 16, 1950, at which time the well was drilling. The well was soon completed and has produced oil ever since.

Reverting now to severed Cause No. 8694. The agreed judgment (Nov. 10, 1942) in that case, as to W/2 of Lot 11, provided:

"It is further ordered, adjudged and decreed that the defendant Earl Hollandsworth upon his cross action herein do have and recover of and from the plaintiffs, Carrie Belle Cate, individually and as independent executrix of the estate of H. M. Cate, deceased, Jeannette (Nettie) Hicks and husband, D.

M. Hicks, J. V. Fleming, trustee, M. W. Harris and John W. Ford, and each of them, title and possession of the oil and gas leasehold estate upon and covering the West half of Lot 11 of said Block 22, comprising and including ⅞ths of the oil, gas and other minerals in and under and which may be produced from said land and all rights purporting to be vested in the lessee by the following described oil and gas lease, viz.:

"Oil and gas lease from Wood County Cotton Oil Company, lessor, to Earl Hollandsworth, lessee, dated January 13, 1941, recorded in Vol. 193, Page 205, Deed Records of Wood County, Texas.

\* \* \* \* \* \*

"In so far as plaintiffs' pleading in this severed cause presents any cause of action for the recovery of the title and possession of the land described in plaintiffs' petition, subject to the rights hereinabove adjudicated to the respective defendants, viz. with reference to the ⅛th royalty interest and with reference to the underlying fee title to said land, subject to the oil and gas leases aforesaid and the rights and title herein adjudicated to said defendants, said issues are dismissed herefrom. Said issues so dismissed herefrom remain to be litigated in said Original Cause No. 8389, styled 'Carrie Belle Cate, et al., v. General American Oil Company of Texas, et al.,' and are not adjudicated by this judgment.

"The title of the defendant General American Oil Company of Texas and the defendant Earl Hollandsworth to the oil and gas leasehold estate and rights hereinabove adjudged to them are hereby quieted as against all claims of the plaintiffs, and each of them."

On the same date some of the plaintiffs in such severed cause executed an instrument "for the purpose of evidencing" the compromise effected, which recited:

"\* \* \* for the same consideration said M. W. Harris and J. V. Fleming, Trustee, have fully ratified and confirmed, and do by these presents fully ratify and confirm unto Earl Hollandsworth, and his assigns, the oil and gas leasehold estate upon and covering the West Half of Lot 11 of said Block 22, and agree and acknowledge that said Earl Hollandsworth and his assigns are fully vested with the entire ⅞ths working interest and all the rights purporting to be vested in the original lessee by and according to the terms of the following oil and gas lease: Oil and gas lease from Wood County Cotton Oil Company, lessor, to Earl Hollandsworth, lessee, dated January 13, 1941, recorded in Vol. 193, Page 215, Deed Records of Wood County, Texas; and they do hereby quitclaim, relinquish and set over unto General American Oil Company of Texas and Earl Hollandsworth, respectively, all right, title, interest and claim in and to the ⅞ths of the oil, gas and other minerals in and under said land purporting to be conveyed by said oil and gas lease and in and to the oil and gas leasehold estates evidenced thereby.

"Nothing herein shall be construed to relinquish the claims M. W. Harris and J. V. Fleming, Trustee, if any, they have in and to the underlying fee title to said property subject to the oil and gas leasehold estate, nor to the ⅛th royalty reserved in each of said leases, but they fully release General American Oil Company of Texas and Earl Hollandsworth and their assigns from any responsibility with respect thereto."

Three days later the remaining plaintiffs executed a similar instrument.

The Cotton Oil Company lease, which the above instruments purported to ratify contained this so-called "lessor estate" and "entirety" clause:

"In case said lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the bonus, royalties, and rentals herein provided for shall be paid the said lessor only in the proportion which his interest bears to the whole and undivided 'fee.

\* \* \* \* \* \*

"If the leased premises shall hereafter be owned in severalty or in separate tracts, the premises, nevertheless, shall be developed and operated as one lease and all royalties accruing hereunder shall be treated as an entirety and shall be divided among and paid to such separate owners in the proportion that the acreage owned by each such separate owner bears to the entire leased acreage. There shall be no obligation on the part of the lessee to offset oil or gas wells on separate tracts into which the land covered by this lease may be hereafter divided by sale, devise or otherwise, or to furnish separate measuring or receiving tanks. It is hereby agreed that, in the event this lease shall be assigned as to a part or as to parts of the above described lands, and the holder or owner of any such part or parts shall fail or make default in the payment of the proportionate part of the rents due from him or them, or shall default in any of the obligations imposed upon lessee by this lease, whether expressed or implied, such default shall not subject this lease to forfeiture or other liability, or affect this lease insofar as it covers that part or parts of said land upon which the said lessee or any assignee hereof shall not be in default."

Mr. Wayland Sanford who represented the General American Oil Company of Texas in the original suit (8389) and who acted for the Humble Oil and Refining Company in effecting the compromise judgment in the severed cause (8694) and under whose supervision such settlement papers were drawn testified regarding these matters as follows:

"Q. All right. Now, what was the substance of all of the conversations between you and Mr. Fleming or between you and anybody else representing the Plaintiffs in that case with regard to the kind of a settlement that would be made of the controversy in that case between the General American Oil Company and the Plaintiffs in that case; what was the substance of the various conversations as near as you can tell? A. The substance was for a stipulated amount of money to be paid to the Plaintiffs in that case, the rights of the General American in their oil and gas leasehold estate would be protected, that the mechanics of that protection would be whatever we dictated; that we would, ourselves, direct the mechanics of consummating a settlement.

"Q. Now, when you say 'we' who do you mean? A. I mean our firm here.

"Q. Yourself and your associates in the practice of law? A. Yes.

"Q. All right. Now, what was the substance of the understanding as to whether the settlement you made would prejudice at all the prosecution by the Plaintiffs in that cause number 8389 of their claim as to the ownership of the royalty interest or any part of the mineral interest in those four lots and the surface, ownership of any part of surface of those four lots? A. It was the understanding that that would not be prejudiced.

"Q. And whatever settlement you made would leave them free to litigate those matters in that cause number 8389? A. That is right.

"Q. Now, then did those negotiations result in an agreement between you as to the kind of settlement that would be made? A. They did.

"Q. What were the mechanics of the consummation of the settlement that you and your associates in law practice decided on as representatives of General American Oil Company? A. They consisted substantially of an order of severance, severing from the lawsuit the issues regarding the oil and gas leasehold estate, and then the filing of pleadings in the severed cause and entry of a judgment in it confirming the oil and gas leasehold rights.

"Q. Who wrote the order of severance and the pleadings of the Plaintiff in the severed cause, the pleadings of Mr. Hollandsworth in the severed case, the pleadings of the General American Oil Company in the severed case, and the judgment to be entered? A. I believe they were all written right here in this office.

"Q. Written by you and your associates? A. Yes.

\* \* \* \* \* \*

"Q. Was it, or not, your intention to draw those various instruments so that they would do what you stated you intended, and that is, leave the issues as to the oil royalty on these various lots 8, 9, 10, and 11, and the surface title to be litigated and decided in cause number 8389 without being prejudiced by this settlement, or that agreed judgment? A. I did not intend, in drawing any of those instruments, that any rights of the Plaintiffs with the respect to the surface of that land or the royalty interest or the reversionary interest would be affected or prejudiced by it. \* \* \* "

On cross examination he testified:

"Q. Now, on direct examination, you've been asked with reference to intentions and understandings of one side or another in connection with these settlement transactions. I'd like to ask you whether or not these papers that were prepared, executed, filed, and so forth, in consummating the settle-

ment, whether you have any information as to whether those papers did or did not truly carry out the understanding you had with reference to settlement with these people? A. You mean the understanding I had with Mr. Fleming and his clients?

"Q. Yes. A. I think I carried it out as well as I could at that time.

"Q. Now, these ratifications that have been introduced in evidence, did you have, in drawing those ratifications, the same intentions with regard to leaving the matter of royalty and surface estate open for litigation in the main case, that you had in drawing the agreed judgment? A. I did.

"Q. And is it—was the substance of the transaction that your intention and understanding, and the intention and understanding of the Plaintiff's attorneys in that case, was the same; that is, that the matter of the royalty interest and the surface estate title was to be left to be litigated without prejudice in the main suit? A. It was not the intention to prejudice the Plaintiffs any more by those ratifications than the judgment.

"Q. (By Mr. Rauhut) Mr. Sanford, all I want to know is whether the judgment in the severed case and the ratification agreements are in accordance with your understanding as to what was to be done in settling this controversy. A. I think they are.

"Q. And the leasehold estate? A. I think they are. I tried to make them in accordance with the understanding."

We have concluded that the judgment of the trial court should be affirmed.

■ We must constantly keep in mind that in this proceeding, which is but a review of a matter over which the Railroad Commission has exclusive original jurisdiction, that neither the Commission, the court below, nor this Court had or has authority to determine substantive questions relating

to title or possession or other rights affecting the property involved. All that the Commission was required to do was to determine that the applicant for the permit to drill had a good faith claim to the tract in suit and that the Rules of the Commission were met. Magnolia Petroleum Co. v. Railroad Commission, 141 Tex. 96, 170 S.W.2d 189.

We will appraise this record and appellants' contentions within the realm of the limited authority indicated above.

We do not understand appellants to contend that there has been any voluntary subdivision by the true owners of the W/2 of Lot 11 which violates the Rules of the Commission in this regard. Rather appellants' position is, as we understand it, that the owners of the W/2 of Lot 11 have agreed to a joint mineral development of the half lot with other lands so as to preclude its separate development the agreement being based upon (a) the pleadings in the main cause (8389) and (b) the agreed judgment and confirmatory documents executed in connection therewith in the severed cause (8694).

Concerning (a) it is quite true that there is language in the pleadings of the owners of W/2 of Lot 11 which, standing alone, are sufficient to ratify and adopt mineral leases covering the four original Glenn lots and on which there had then been drilled 3 producing oil wells.

The extent of the pleadings of plaintiffs in that cause has been indicated above and will not be repeated here. It plainly appears therefrom that the alleged ratification was predicated upon the assumption that upon such ratification becoming effective plaintiffs would receive some of the oil produced from one or more of such wells. We believe the pleadings to be subject to no fair construction other than that the ratification was conditional.

It further appears that this proffered ratification was rejected by the trial court which entered a judgment that plaintiffs take nothing and by the Court of Civil Appeals and the Supreme Court on appeal.

There was a recovery on appeal of the title to W/2 of Lot 11 but no recovery of any royalty from any of such producing wells. We believe it appropriate here to quote from the Court of Civil Appeals opinion in that case because such opinion was before the Commission when it granted the permit in suit.

"In the event they are denied a recovery of their one-fifth interest in each of lots 8, 9, 10 and East half of 11, by reason of above discussed limitation claims, and premised upon the facts that each of the four lots were equal in size and value, with title emanating out of W. B. Glenn and wife, the common source of title, plaintiffs assert that they are entitled to recover the whole of the West half of lot 11. This contention is sustained." [222 S.W.2d 335.]

The Court then discusses the doctrine of equitable partition and proceeding further says:

"The cotton oil company in January, 1941, executed and delivered to Earl Hollandsworth an oil lease for a ten year primary term and therein described the land so leased as being 'all of lot 12 and West half of No. 11, in Block 22, Hawkins, Texas, townsite.' In addition to the usual $\frac{1}{8}$ royalty, the lease also provided for certain overriding royalty to be paid lessors out of production. The lease provides: 'In case said lessor owns a less interest in above described land than the entire and undivided fee simple estate therein, then the bonus, royalties and rentals herein provided for shall be paid the lessor only in the proportion which his interest bears to the whole and undivided fee.'

"The spacing rule in force in the Hawkins field at the time above lease was executed and at all times since pro-

vided that 'no well shall be drilled here-after for oil and gas  *  *  *  nearer than 933 feet to any other completed or drilling well on the same or adjoining tract, and no well shall be drilled nearer than 466 feet from any property, lease or subdivision line; provided that, subject to the further provisions hereof, the commission, in order to prevent waste or to prevent the confiscation of property, will grant exceptions to permit drilling within shorter distances  *  *  *' The permit to drill was granted under above exception, it so stating.  In April, 1941, the Railroad Commission of Texas granted Hollandsworth under the exception to the general spacing rule a permit to drill a well on above leasehold, namely, 'Well No. 1, Wood County Cotton Oil Company, 0.12 acre Brewer Survey, as shown by plat submitted, to be spaced 22.5 feet from East and West lines and 57.5 feet from North and South lines.' The oil produced since July, 1941, under above leasehold and permit, located in the center of the area, wholly on lot 12 and only 7.5 feet west of W. B. line of 11, has been purchased by the Humble Oil & Refining Company.

"Plaintiffs contend that the cotton oil company having included the West half of lot 11 with lot No. 12 in above lease, that the lease by such act became as a matter of law an unitized lease; that the cotton oil company, the railroad commission in the permit so issued, and the lessee in his operations so treated both tracts as a single unit of land or unitized lease.  Grounded upon the above position and the further claim that the cotton oil company, as co-tenant with plaintiffs in the West half of lot 11, having the legal power to lease and include the latter lot in the lease so as to bind plaintiffs, they claim they are entitled to recover ⅓ of the royalty produced from the alleged unitized lease, being in the ratio that the area of the West half of 11 bears to

the two tracts described in the lease. There is strong probability of drainage of oil from the West half of lot 11, and much merit to the argument that to deny them the claimed pro rata of the oil would permit the cotton oil company to reap the benefits of its own wrong.

"If, as we have hereinabove concluded, that plaintiffs are entitled to recover all the interest in the West half of lot 11, there is no legal authority to hold that it executed the lease as a co-tenant of plaintiffs.  There is not an intimation in this record that it intended to act as the co-tenant or agent of any one.  Damages for the alleged mistake or wrong is not here being litigated.

"*  *  * It is without controversy that the cotton oil company executed the lease in good faith believing it to be owner of the whole of the West half of lot 11.  It did own lot No. 12. It is our opinion that the cotton oil company intended the two lots to constitute one tract.  If the cotton oil company did not in fact own the West half of 11, as we have hereinbefore concluded, it does not follow that the said company intended by its act to assign over to the owners of the West half of 11 one-third of the oil produced from the lot it did own.  In the unitized leases discussed above and others that could be cited there is the controlling element of the intent of the several owners to pool their respective tracts in a common undertaking or joint venture.  Such intent is not in evidence here.  Plaintiffs did not join the cotton oil company as lessors.  They are not named.

"In addition to the reasons advanced in Japhet v. McRae, supra, 276 S.W. at page 671, contrary to the plaintiffs' position on drainage, it appears that plaintiffs possessed an equal right to protect drainage and obtain a permit to drill on West half of 11 that the

Wood County Oil Company then possessed to obtain a permit to drill only on lot 12 under the above quoted exception to the general rule, namely, 'in order to prevent waste or to prevent the confiscation of property.'

"The judgment of the lower court is reversed and here rendered to the extent that plaintiffs recover title and possession to the West half of lot No. 11 and the judgment in all other respects is affirmed."

Passing now to a consideration of contention (b), supra, we observe that appellees contend the owners of the W/2 of Lot 11 having lost, in the appealed case, their right to participate in the oil royalties from the well on Lot 12 will, unless they have the right to a well on such half lot, have won an empty victory since the surface of the half lot is worth less than $100.

Appellants' reply to this is that these owners should recover their proportionate royalty from Hollandsworth under the entirety clause in the Cotton Oil Company lease. This, of course, goes back to the question of ratification.

We also observe that Hollandsworth, the lessee, was not a party to the title and royalty case, main suit, and that the Cotton Oil Company was not a party to the severed or oil lease cause, although both were parties to the respective suits. It might be technically argued that neither of such parties was bound by the judgment to the suit in which it was not a party. We do not believe that such rule, if applicable at all, is applicable here.

There was but a single problem for all concerned in this controversy—the determination of the rights, if any, of the non-joining Glenn heirs in the four lots. It is true that many ramifications were presented in solving this problem. The parties, with the consent of the Courts, devised a procedure for the orderly and efficient disposition of them all.

The Cotton Oil Company was interested in the fee title to the lots and to its royalty as lessor. It won its royalty claim as to producing well and lost its fee claim to the W/2 of Lot 11 in the appealed case and was bound thereby.

Hollandsworth, as lessee, was primarily interested in the 7/8ths working interest in the well on Lot 12. The W/2 of Lot 11, wrongfully included in his lease, was, considered as a part of such lease, of only nominal value.

We believe that the agreed judgment and confirmation documents are effective to confirm and ratify the leasehold estate of Hollandsworth but as separate tracts and not as a single tract, Lot 12 being considered as one tract and the W/2 of Lot 11 being the other tract.

If we should adopt appellants' theory and hold both tracts subject to a single lease and joint development and relegate appellees to their portion of the royalty from the well on Lot 12 under the entirety clause, then where would this royalty come from? If from the royalty reserved to the Cotton Oil Company then the judgment in the appealed case would have to be avoided. If such royalty should come from Hollandsworth 7/8ths working interest then the judgment in the severed cause would have to be avoided.

We believe that the agreed judgment, nothing more than a dignified contract, the confirmation agreements and the proceedings in the appealed case, all relating to the same common problem, are binding upon all parties, and that they should be construed together. Guadalupe-Blanco River Authority v. City of San Antonio, 145 Tex. 611, 200 S.W.2d 989.

If there is any irreconcilable conflict between the two cases, which we do not find, then, the proceedings in the severed cause should yield to the appealed case because, as we construe the record, such proceedings were subordinated to such case and were of less dignity.

We believe that appellant Humble construed this matter consistently with our

conclusion here when in 1948 it wrote attorneys for the plaintiffs in the severed cause:

"However, I do want to direct your attention to the fact that your clients have no interest in Lot 12, upon which the Wood County Cotton Oil Company's well is located, and accordingly, under the decisions of this state, they will not be entitled to participate in the proceeds from said well."

Also in 1949 when it wrote Hollandsworth:

"We have been advised of the settlement of lawsuit entitled Carrie Belle Cate et al vs. General American Oil Company et al, No. 8389 in the District Court of Wood County, Texas, in which suit we understand the Plaintiffs were awarded the W/2 of Lot 11 in Block 22 of the town of Hawkins, Texas, in the Geo. Brewer Survey, Wood County, Texas. Our Law Department has therefore requested we prepare an amended Division Order covering your Wood Co. Cotton Oil Co. tract to describe only Lot 12 in Block 22, thereby eliminating the W/2 of Lot 11."

A similar construction was made by Humble in a title opinion written in 1951 showing the full 1/8th royalty in the W/2 of Lot 11 to be owned by appellees herein.

Our decision here harmonizes with our recent holding in Humble Oil & Refining Co. v. MacDonald, Tex.Civ.App., 279 S. W.2d 914, writ ref., N.R.E., where we reversed and rendered judgment cancelling a permit to drill issued in the face of a jury verdict and trial court judgment which destroyed the basis of the permit. The reverse of that situation is presented here to the extent that the Commission had before it an appellate court pronouncement as to rights of the applicants which formed the basis for issuance of the permit.

It is our considered judgment that the Commission did not err in relying upon that opinion under all the facts shown by this record.

The judgment of the trial court is affirmed.

Affirmed.

## On Motion for Rehearing

Appellants except to our statement that the west half of Lot 11 was "wrongfully" included in the Cotton Oil Company lease to Hollandsworth. In Harris v. Wood County Cotton Oil Co., Tex.Civ.App., 222 S.W.2d 331, it was held that the Cotton Oil Company did not own the west half of Lot 11. This, to our minds, made such inclusion wrongful.

Appellants, citing Thomas v. Southwestern Settlement & Development Co., 132 Tex. 413, 123 S.W.2d 290, 297, contend that the equitable partition decreed in Harris, supra, was not effective until the court acted. This is undoubtedly correct but such "effectiveness" may bear explanation and interpretation. We quote from the Development Company case:

"Quotation at length has been made from the opinion in Arnold v. Gauble [49 Tex. 527], because it announces the following conclusions pertinent to the question presented in the instant case: A deed by one cotenant purporting to convey the entire interest in a part of the commonly owned land conveys such interest, and only such interest, in the land as the maker of the deed possesses. When the nonjoining cotenant sues for partition equity will require, so far as it can be practically done, consistently with the rights of the plaintiff in making the partition, that the partition be so made as to set aside to the grantees in the deed from the one cotenant, especially when he has made improvements, that part of the land which was conveyed to him. When that is done the deed will mature into title. Before the land is thus set aside to such grantee the conveyance to him is voidable,

in the sense that it is subject to be disregarded if necessary to give the nonjoining cotenant his full share of the land, in the partition, and subject, on the other hand, to maturity into title by the entry of decree of partition awarding to the grantee the tract which was conveyed to him."

Now a voidable deed which "matures into title" would, absent contrary direction, mature such title as of the date of the conveyance. This being true then it would seem that the title of the nonjoining tenant to his specific interest would mature as of the same time. However this may be we feel bound by the decision in Harris that the Cotton Oil Company had no interest in the west half of Lot 11 at the time of the lease to Hollandsworth and it is unnecessary for us to determine at what exact time the R. P. Glenn interests acquired full title to the west half of Lot 11.

Other points made in the Motion for Rehearing have been considered but do not, in our opinion, call for further discussion.

The motion is overruled.

Motion overruled.